RUSH v. LAKE.

(Circuit Court of Appeals, Ninth Circuit. May 4, 1903.)

No. 898.

1. BANKRUPTCY—ALLOWANCE OF CLAIM—REVIEW ON APPEAL.

On review of an order of a referee disallowing a claim, the District Court filed an opinion disapproving of finding of fact made by the referee on which the disallowance was based, but entered no order in the matter. Afterwards the referee, following such opinion, entered an order allowing the claim, which was approved and confirmed by the court. *Held* that on appeal by the trustee from such judgment of the court allowing the claim, which was the first judgment or order from which an appeal could be taken, the question of fact involved was open to review by the Circuit Court of Appeals.

2. SAME—PROOF OF PARTNERSHIP—EVIDENCE CONSIDERED.

Evidence examined, and *held* to sustain the finding of a referee that one claiming to be a creditor of the estate of a bankrupt was a silent partner of his business.

Appeal from the District Court of the United States for the Eastern Division of the District of Washington.

For opinion below see 111 Fed. 893.

This is an appeal from the judgment of the District Court allowing the claim of the appellee against the firm of E. C. Clark, bankrupt. Clark had entered into business at Spokane, Wash., about August 1, 1899, with G. J. Reiter, under the firm name of Clark & Reiter. On June 1, 1900, Reiter sold his interest in the firm to Clark for the sum of $400 cash, Clark assuming and agreeing to pay off the existing debts against the firm. At that time the firm was owing, according to the findings of the referee, $18,358.96. Clark continued the business under the name of E. C. Clark. Some of the debts were reduced in amount, some were paid, some were increased, and new debts were contracted. At the time of the dissolution, according to the books of Lake, the appellee, Clark & Reiter owed him $9,313.96. Lake loaned Clark thereafter $1,900, and took his note therefor. On January 28, 1901, Clark filed his petition in bankruptcy, and on the same day was adjudged a bankrupt. His schedule showed his assets to be $20,197.56, and his liabilities $27,005.78. Lake presented his claim against the estate, to which objection was made on the ground that he was a partner in the firm of Clark & Reiter, and a partner with E. C. Clark after the dissolution. On August 21, 1901, the referee disallowed the claim, on the ground that upon the testimony taken before him he found that Lake was a partner in the firm of Clark & Reiter. Thereafter Lake filed his petition for a review of the order of the referee, and that officer certified to the court the question of fact whether Lake was such partner, together with the testimony which had been taken before him. The District Court filed an opinion, in which he reviewed the testimony and reached the conclusion that it was not sufficient to show that Lake was such partner. The court made no order, however, allowing the claim, and no judgment was entered thereon. The referee thereafter, in pursuance of the opinion of the District Court, on March 12, 1902, allowed Lake's claim. The trustee thereupon filed his petition for review of that order, and on June 10, 1902, the District Court rendered judgment in the following terms: "Upon hearing said matter, it is ordered and adjudged that the order of the referee allowing said claim is approved and confirmed." Within 10 days from the date of that judgment the present appeal was taken.

¶ 1. Appeal and review in bankruptcy cases, see note to In re Eggert, 43 C. C. A. 9.

122 F.—36

Samuel R. Stern, for appellant.

Graves & Graves, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The appellee contends that the court on this appeal is precluded from entering into a consideration of the question of fact presented in the record, for the reason that the appeal was not taken within 10 days from the date when the District Court passed upon that question as it was presented to him on the petition of Lake. But the record does not show that any order or judgment was made by the District Court upon that hearing. It is true that the District Judge filed an opinion which is reported in Re Clark, III Fed. 893, but nothing further was done, and the conclusion of the court was never placed in the form of a judgment. The first and only judgment that was entered in that court was the judgment of June 10, 1902, from which the present appeal was taken. Until that date there was nothing from which an appeal could be taken.

The only question which we find it necessary to consider in this case is whether or not E. W. H. Lake was a silent partner in the firm of Clark & Reiter. The referee in bankruptcy, before whom the witnesses appeared and testified, found that he was a partner. The District Court was of the opinion that the evidence was not sufficient to sustain that finding. We have carefully examined the testimony. We think it clearly shows that both Reiter and Clark considered that Lake was a secret partner in the firm. In the spring of 1899, Lake was and still is the owner of a retail dry goods store in Atchison, Kan., and Clark had been for several years his intimate friend. Clark was then the buyer and manager for the Western Coal & Mining Company at Pittsburg, Kan. Reiter was employed at Deer Lodge, Mont. He and Clark were "old friends." On April 26, 1899, Clark wrote to Reiter a letter which contained the following:

"Now in regard to our business I have been up to Atchison this week and have had a long talk with Lake. Lake is not on the road. He is making a barrel of money in the retail business. Lake would like to take an interest with us and is willing to take my word for it. We could arrange to get almost any kind of a deal. If there is an opening suitable here could put in a good-sized stock but of this I can't form an opinion. Now I think it would be a good idea to take him in for several reasons which will readily occur to you. If you think desirable to go into that new country, you would not need a very large stock to begin with. I can't get what means I have before July or August but if you are satisfied with this proposition why go ahead. I will take your judgment for it. Lake and I will furnish $1000.00 in cash and you put in $500 as equal partners. You allow yourself a salary to be governed by what there is in the business; we will help all we can on this end of the line. We are willing to put this into anything that you say is right."

There was other correspondence between Clark and Reiter which is not in the record. According to Reiter's testimony, the negotiations between them culminated in an understanding, whereby, as he understood it from Clark, Clark, Reiter, and Lake were, in case a favorable location were found, to open a store in some town in the

West. In pursuance of that understanding, Reiter went from Montana to Pittsburg, Kan., spent two or three days there with Clark, and then with Clark went to Atchison to see Lake about the middle of June, 1899. Reiter testified that in a conversation with Lake the witness proposed going into business at Billings, Mont., but Clark thought the town was too small, and that Spokane would be better; that while at Atchison he did not discuss the subject of the partnership with Lake, having understood from Clark that a partnership arrangement had been made with Lake; that Clark so informed him, and that he, Reiter, had always understood that Lake was a partner. He testified that, when he was about to leave Atchison to go to Spokane, Lake said to him: "If we decide not to go into Spokane, he says, not to open up the business there, he says, you send me an account of your expenses you have been to in looking up a place, and I will remit you a draft for the amount." He further testified that Lake did not want his name mentioned as a partner, that Clark requested him not to mention Lake's name, and that Clark subsequently told him: "Mr. Lake says that if you prove to be all right, you will go in, and the business is a success, you will be a full partner." He said: "My understanding was that I would put in what money I had, and Mr. Clark would put in what money he had, and Mr. Lake would go the balance." He testified, further, that he understood from the way Lake talked over the location while they were at Atchison, and discussed it, and gave his ideas as to how the business ought to be carried on, and discussed the conditions at Spokane and the location that could be obtained, and from his inquiries about pay rolls in the town, and the number of dry goods stores and the competition, and other matters pertaining to the business, he "could not take it as anything else" but that Lake was to be a partner. He (Reiter) testified that, after the business was opened in Spokane, Lake was in constant correspondence with Clark, and that it was his understanding that all the money which Lake furnished for which he took no notes, and the first goods which he sent to Spokane, were his portion of the capital of the firm. He testified also that just before he sold out to Clark on June 6, 1900, Clark remarked to him: "Well, you can buy us out, or we will buy you out."

Clark, it is true, denied that Lake was a partner, and testified that the money and goods put into the business by Lake were a loan, and not a contribution to the capital of the firm. His testimony is contradictory and unsatisfactory, and, in our opinion, manifests a disposition to shield Lake from liability. He testified that Lake never agreed to be a partner, and he explained his letter of April 26, 1899, above quoted, by saying that what he wrote were the vaporings of his imagination. But he also testified that in all his dealings with Lake and Reiter he had been honest with both. But the facts speak in plainer terms than Clark's denials and explanations. The business of Clark & Reiter was started at Spokane by buying out the stock of goods of Louis Budde, who was in business at that place. There were no partnership articles of the firm of Clark & Reiter. Reiter contributed $900 to the firm's capital, Clark contributed $1,400, and Lake remitted by drafts $2,400, and sent a large consignment of goods

from his own retail store at Atchison to the store at Spokane, amounting at cost price to $3,700. The money so sent was entered on the books of Clark & Reiter in the same manner as the money which was contributed to the capital stock by Clark and Reiter. On the cash book the first item is "E. W. H. Lake, $1,000." We give but little weight to this circumstance, however, as it is apparent that Clark and Reiter were not expert in bookkeeping. The bills of the goods which were sent by Lake contained the cost price thereof, but no mention of time or terms of payment. About the time when the firm began business in Spokane, Clark made a statement to Dun's Agency, in which he placed the capital stock of the firm at $8,000. On July 6, 1899, Clark was back at Atchison. On that date he wrote from Lake's store to Reiter as follows:

"Dear George: I have had nothing from you since I left. I am now here picking out some stuff, and will go to St. Joe today. You will have to make that transfer with old man Budde. We will send you money to make the transfer with. Now, we want you to take stuff as near as possible as follows, etc. * * *. Don't let the old man work you. We will send you money next week so that you can close it up. I would like to have had you here, but we thought the expense too much. * * * Will write you tomorrow; am in a hurry. The firm name will be Clark & Reiter. Our capital will be $8000.00. Lake is carrying me for the balance of the stock. I am pledging him my credit. I will try your share in this satisfactory; I think you will be satisfied with the deal."

The opinion of the District Court seems to have been largely influenced by the last few lines of the letter just quoted, and the court remarked that this was at least a plain notice to Reiter that the plan of the partnership first proposed had not been carried into effect, and that Lake had become a creditor of Clark. With deference to the opinion of the learned District Judge, we take a different view of the meaning of these words. The statement that "our capital will be $8,000" seems to us a plain declaration that the amount which was to be contributed to the capital of the partnership by the partners was $8,000, and that the further statement that "Lake is carrying me for the balance of the stock. I am pledging him my credit" means that Lake was to loan the funds necessary to purchase merchandise, over and above that which could be bought with the $8,000 capital of the partnership. This interpretation is sustained by the facts. The firm, according to its statement to Burnham, Hanna, Munger & Co., of Kansas City, of date August 9, 1899, which statement was made for the "purpose of obtaining credit," opened business at Spokane with merchandise representing at actual cost $14,000, and Lake did in fact loan to the firm in the fall of 1899 and the spring of 1900, before the dissolution of the firm, sums amounting to $3,800, for which he took the notes of the firm. On July 9th, Clark wrote from Lake's store to Reiter as follows:

"I received your letter of the 3rd. * * * I have your wire in regard to the Boston store. If that stock is going to be sold in a lump we want to bid on it. Find out and let us know. Use the wire if it is to be sold. We would not ship stuff already picked out. I enclose bill for thread which will show you what we should pay for it."

The telegram referred to in this letter was one which Reiter had sent informing Clark of the proposed sale of the stock of the Boston

store at Spokane. On July 10th, Clark telegraphed back to Reiter as follows:

"Your wire received. As I have had no letter I can't guess just what you have in view. I am going ahead to get out stuff at any rate. I don't exactly understand the reasons for that failure. What became of the stock? If it is on the market to be bought outright, we are in it up to 50 to 55 cts. on the dollar of inventory. Let me know about this to Atchison. Use the wire if necessary. Better address Lake for I may not be here. I am doing the best I can to get things ready for a fair start and hope you will be satisfied. Will write you tomorrow."

On the same day Clark wrote to Reiter:

"I note the stuff you have selected. You did not select any wide sheetings. These goods are clean out of sight and we should have them. We are sending you today exchange for $1000.00 to pay old man Budde on the 15th and try to have him extend the time (by contract) till August 1st. If he will not do this in a legal way, send us a wire as soon as you know and we will arrange to pay the balance before the 20th as per contract. Address all correspondence to me in care Lake for the present. * * * I received your wire about the Boston store and wrote you fully in regard to it. We expect a letter at Atchison from you today. This may enlighten us somewhat. I wired you Saturday in regard to putting in some clothing but have not heard from you."

On August 9, 1899, for the purpose of obtaining credit with Burnham, Hanna, Munger & Co., of Kansas City, Clark made a statement of "present true financial circumstances," as a basis of credit with that firm, in which he placed the merchandise of Clark & Reiter at $14,000 actual cost, and listed the liabilities of the firm, consisting of sums owing to various wholesale houses, and $700 borrowed from a bank, aggregating in all $4,930, and placed the total worth of the firm, over and above all liabilities and exemptions, at $9,000. There was no mention made of Lake in this statement, or of any liability to him. Clark explains this omission in the statement, and in all the other statements he gave of the assets and liabilities of the firm, by saying that he knew that Lake would not press the firm for the debt which was owing him, and he attempts to explain the use of the plural "we" and "us" in the extracts from the letters above quoted by saying that, while he was manager and buyer for the coal company, he had become so accustomed to use the plural that by inadvertence he used it when he should have used the pronouns "I" and "me." This explanation does not seem to us either probable or reasonable. It will be noticed that in these letters Clark always used the first person singular when he was referring to himself and his own movements, and that he never used the plural except in cases where, if it were true that Lake was a partner, it was proper to use the plural. Upon the theory that Lake was a partner in the firm, there is not a single instance of the misuse of pronouns anywhere in his letters.

But it is not enough that Clark and Reiter both supposed and understood that Lake was a partner, or that they so conducted their correspondence or made entries on their books as to indicate that he was. There must be other evidence of the fact before Lake can be found to be interested as a secret partner in the firm. The evidence tending to show that he was so interested is in this case, as in most

cases of a secret partnership, chiefly circumstantial. Lake denied that he was a partner, or that he ever had contemplated entering into partnership with Clark and Reiter, and he testified that the money he had forwarded and the goods he had advanced at the time when the store was opened at Spokane were loans to Clark, to be repaid immediately. As tending to contradict this statement, however, is the fact that for the money and goods which were sent to the firm of Clark & Reiter, to wit, the $2,400 sent in July, 1899, on which $500 had been repaid, and the $500 sent in September, 1899, which, together with the money put into the firm by Clark and Reiter, aggregated $7,900, or practically the full sum of $8,000 which was said to be the capital of the firm, Lake never received or demanded any note or obligation of any kind, either from Clark or Clark & Reiter, and that subsequently he made various loans of money to the firm, amounting in all to $3,800, for all of which, without exception, he took the firm's notes. Reiter testified, as already stated, that, when he left Atchison to come to Spokane, Lake said to him: "If we decide not to go into Spokane, he says, not to go into business there, he says, you send me an account of your expenses you have been to in looking up a place, and I will remit you a draft for the amount." Here is direct testimony, contradicted, it is true, by Lake, but, if true, tending strongly to show that Lake admitted that, if the situation at Spokane proved satisfactory, the business would be opened there, and he was to be a partner. In this connection it is proper to note that on this appeal no question is made by either side of the credibility of Reiter's testimony, and that we agree with the District Court, who remarked: "From reading the testimony of Mr. Reiter, I am convinced that he is a candid and an honest man." Another circumstance is the fact that on the day on which Clark and Reiter left Atchison for Spokane, June 19, 1899, to buy out Budde, Lake decided to send with them his brother-in-law, Hussey, who was the manager of his store at Atchison. Hussey went with Clark and Reiter to Spokane, and remained there two or three days, and was in consultation with Clark and Reiter in connection with their negotiations with Budde. Clark admitted that Hussey said to them: "Offer the old man three hundred dollars for his fixtures, and if he don't take it let him go." Both Hussey and Lake testified, however, that Hussey's trip west had no connection with the business of Clark & Reiter, but that he went only for a vacation, and that he was gone a month or six weeks before he returned. It is a significant fact, however, that there had been no thought or mention of this vacation prior to an hour or two before Clark and Reiter left Atchison, and that Lake bought and charged himself with the expense of Hussey's round-trip ticket by way of Spokane to Portland and return, and furnished him $60 in cash for his expenses, which item of $60 was charged upon Lake's books at Atchison, "June 28, 1899, expense P. A. Hussey, Spokane." Again, it is shown that, in response to the information which came early in July from Reiter to Clark and Lake of the proposed sale of the Boston store at Spokane, Lake, in August, 1899, went to Spokane, and spent some days there, and examined the stock of that store, and left with Clark & Reiter a bid to be put

in for the stock when it should be sold. Lake testified that his visit to Spokane was made with a view to becoming a possible purchaser of the goods of the Boston store for his own store at Atchison, and such may have been the case, but, aside from Lake's testimony, all the circumstances and probabilities, as well, as Clark's telegram, would seem to oppose that theory, and to indicate that he went there for the purpose of investigating the goods with a view to buying the same for the firm of Clark & Reiter. While at Spokane, he spent much of his time in the store of Clark & Reiter, and, according to the testimony of Reiter, had access to the books of that firm, and had frequent conversations with Clark about the business of the firm. It is not conceivable that at that time he did not know just the amount that Clark & Reiter had contributed to the capital stock, yet nearly a year later, immediately after Reiter withdrew from the firm, when Lake received from F. M. Yale, of St. Louis, Mo., one of the creditors of Clark & Reiter, a letter, of date July 13, 1900, referring to the fact that Reiter had retired from the firm, and stating: .

"We have a fall order for Mr. Clark amounting to nearly $2000.00, and it has been suggested to us that you were financially interested as a silent partner or in some such way. You know I will keep any information you might give us strictly confidential, and that all I care about is to assure myself of Mr. Clark's responsibility."

—Lake answered:

"As you probably know I have a very high opinion of Mr. Clark's business ability, and think a great deal of him. I have done all I could to help him get a start and he has built up a very fine trade there in a short time, and think he is going to make a big success. I know he is honest and reliable, and believe he will pay what he contracts to. He had about eight or nine thousand dollars to start out there. As far as Mr. Reiter going out of the firm is concerned, it cuts no figure, as he only had about $400 in there."

This letter does not exhibit Lake in a favorable light. Aside from his silence when directly asked the question whether he was a silent partner in the firm, and his failure to furnish information of his own claim against Clark, which, at that time, according to his present contention, was in the neighborhood of $10,000, the letter contains two distinct misstatements of facts. One is the statement that Reiter had only about $400 in the firm. Lake, in his testimony, admits that this was not true; that he knew Reiter had put $900 in the firm. Another is the statement—which, if Lake were not a partner, was also untrue—that Clark "had about eight or nine thousand dollars to start out there." No one, we think, can examine the testimony in this case and believe that Lake ever at any time believed that either Clark or Clark & Reiter together had, aside from what he furnished them, $8,000 or $9,000 to start with. Nowhere in his testimony does he claim that any portion of the money and goods which he sent to the firm at the time when it commenced business was included in this capital of "eight or nine thousand dollars." On the contrary, he attempts to justify the statement contained in his letter by testifying that it was his understanding that at the time of the formation of the partnership Clark had property of the value of between six and seven thousand dollars, consisting in stock in a flour-

mill in Kansas and some building and loan stock, upon which Clark expected very soon to realize, the proceeds of which were to go in as his contribution to the capital stock. He also testified that the money and goods which he advanced at the time of the formation of the firm were a loan, not to the firm, but to Clark, to be paid back by Clark immediately, as soon as his stock in the mill and the building and loan association could be sold, and that for that reason he took no notes for either. But the plain facts which confront this statement of Lake are that the money and goods are all charged on Lake's books, not to Clark, but to Clark & Reiter; that Clark did not immediately or at any time repay Lake the money so loaned, or pay him for the goods so advanced, except that on July 15, 1899, he sent him $200, and four days later $300, making $500 in all, which was evidently paid by Clark out of the proceeds of his mill and building and loan association stock, which he sold on July 14, 1899, for $1,000; and that, notwithstanding the failure of Clark to repay immediately out of the proceeds of these stocks the very considerable sum which Lake claims was due him, it is not shown that Lake ever demanded the repayment, or made further inquiry about Clark's resources, but it is shown, on the other hand, that on September 6, 1899, Lake furnished the firm $500, equal to the sum so repaid him by Clark, for which he took no note, and that very soon afterwards he loaned to the firm on the firm's notes, as we have already seen, additional sums amounting to $3,800. Lake must have well known, long before the time when he wrote the letter above quoted, that Clark never received from his stocks but $1,000, and that that sum was a part of the $1,400 which he contributed to the capital stock of the firm of Clark & Reiter. According to Clark's testimony, he (Clark) was in debt to the mill company for a portion of the purchase price of his mill stock, and his building and loan association stock was pledged for a debt which the mill company owed a bank, and all that he ever realized out of either of said stocks was the $1,000, which was paid him on July 14, 1899. He testified also, before either Reiter or Lake had testified, or the testimony of any other witness had been taken in the case, that he had, at the time of the formation of the firm, between $1,200 and $1,500, which was not all money at that time, but a portion of which was invested in a mill and some building and loan stock, for all of which he got about $1,000, and that all he ever claimed to have put into the firm was $1,500. It is to be noted that Lake, on his cross-examination concerning his statement that Clark owned between six and seven thousand dollars at the time of entering into the partnership of Clark & Reiter, admitted that he never made any inquiry about the building and loan association, nor the value of its stock, nor in whose possession Clark's stock was held, nor what Clark's interest in the mill was, except that Clark told him he had between $2,500 and $3,000 in it; that he had never inquired, and Clark never told him, how much he had put into the mill, nor how extensive was the business of the mill, nor how many men were employed, nor whether they were making money. We think Lake's statement, that Clark had about eight or nine thousand dollars to start out there, can only mean that Lake himself

had contributed enough in money and goods to make up about that amount, when added to what Clark and Reiter had put in. Clark admitted that he always included those advances of Lake in the $8,000 capital which he claimed for the firm in his various statements to Dun's Agency and others, and he testified distinctly that no arrangement was ever made with Lake as to the time or terms of the repayment of those advances, and that nothing was ever said about interest or security. It is in evidence that at the very time when Lake was advancing this money and these goods to Clark & Reiter, concerning which no agreement was made as to interest or security, he was in June, July, and August, 1899, borrowing upon his notes money from a local bank in Atchison, among which transactions, according to his books, appears a loan of July 6th of $1,000, and one of July 22d of $1,000, and on that date a renewal of a $2,000 note, on all of which sums he paid interest at over 8 per cent. per annum.

Although frequent letters passed between Clark and Lake, they both testified that all letters have been destroyed, and that no copies have been kept. These letters, if preserved, would undoubtedly show what the true relation was between Clark and Lake. The fact that they were not preserved is a circumstance to be taken into the account.

The appellee produced the testimony of his wife and his brother-in-law, who each testified, in substance, that about the 1st of June, 1899, Lake remarked to them separately, but in Clark's presence, that Clark had requested him to become a partner with him in business, but that he had refused. Conceding it to be true that these remarks were made by Clark, it does not necessarily follow that they were made in good faith, nor does it follow that prior to that time Lake had not held out assurances to Clark such as to justify the latter in writing the letter of April 29, 1899, or that later, about the middle of June of that year, when Clark was again at Atchison, Lake had not changed his mind and agreed to engage in the enterprise as a partner. We think the evidence is sufficient to justify us in finding that Lake was a partner, as found by the referee.

The judgment of the District Court will be reversed, and the cause remanded for further proceedings not inconsistent with the foregoing opinion.